IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KLAUSTECH, INC.,

    Plaintiff,

v.

GOOGLE, INC.,

    Defendant.

No. C 10-05899 JSW

**CLAIMS CONSTRUCTION ORDER**

The Court has been presented with a technology tutorial and briefing leading up to a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996). This Order construes the disputed claim terms selected by the parties, which appear in the patent at issue in this case: United States Patent No. 6,128,651 ("'651 Patent") entitled "Internet Advertising with Controlled and Timed Display of Ad Content from Centralized System Controller."

## BACKGROUND

Plaintiff KlausTech, Inc. ("KlausTech") contends that Defendant Google, formerly AdMob, Inc. ("Defendant") infringes its patent. KlausTech's patent relates to the technology governing an internet advertising system that allows a non-scrolling display for advertising at guaranteed minimum intervals. The frame on the user's website "displays controlled and timed ad content under the control of a centralized system controller." ('651 Patent at 1:7-9.)

The Court shall address additional facts as necessary in the remainder of this Order.

///

///

**ANALYSIS**

**A.     Legal Standard.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman*, 517 U.S. at 372. The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure Water*, 381 F.3d at 1116. As a result, when a court construes disputed terms, it "looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id*. In most cases, a court's analysis will focus on three sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). However, on occasion, it is appropriate to rely on extrinsic evidence regarding the relevant scientific principles, the meaning of technical terms, and the state of the art at the time at the time the patent issued. *Id.* at 979-81.

The starting point of the claim construction analysis is an examination of the specific claim language. A court's "claim construction analysis must begin and remain centered on the claim language itself, for that is the language that the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted). Indeed, in the absence of an express intent to impart a novel meaning to a term, an inventor's chosen language is given its ordinary meaning. *York Prods., Inc. v. Cent. Tractor Farm & Family Center*, 99 F.3d 1568, 1572 (Fed. Cir. 1996). Thus, "[c]laim language generally carries the ordinary meaning of the words in their normal usage in the field of the invention." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003); *see also Renishaw v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"). A court's final construction, therefore, must

accord with the words chosen by the patentee to mete out the boundaries of the claimed invention.

The court should also look to intrinsic evidence, including the written description, the drawings, and the prosecution history, if included in the record, to provide context and clarification regarding the intended meaning of the claim terms. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002). The claims do not stand alone. Rather, "they are part of 'a fully integrated written instrument.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 978). The specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. The specification also can indicate whether the patentee intended to limit the scope of a claim, despite the use of seemingly broad claim language. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (recognizing that when the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question").

Intent to limit the claims can be demonstrated in a number of ways. For example, if the patentee "acted as his own lexicographer," and clearly and precisely "set forth a definition of the disputed claim term in either the specification or prosecution history," a court will defer to that definition. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In order to so limit the claims, "the patent applicant [must] set out the different meaning in the specification in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning." *Innova/Pure Water*, 381 F.3d at 1117. In addition, a court will adopt an alternative meaning of a term "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness*, 288 F.3d at 1367. For example, the presumption of ordinary meaning will give way where the "inventor has disavowed or disclaimed scope of coverage, by using words or expressions of

3

manifest exclusion or restriction, representing clear disavowal of claim scope." *Gemstar-TV Guide Int'l Inc. v. ITC*, 383 F.3d 1352, 1364 (Fed. Cir. 2004). The disclaimer in the prosecution history must be "clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). Likewise, the specification may be used to resolve ambiguity "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.

Limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary. *Id.* at 1326; *see also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'") (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)). To protect against this result, a court's focus should remain on understanding how a person of ordinary skill in the art would understand the claim terms. *Phillips*, 415 F.3d at 1323. Additionally, "[w]hen consulting the specification to clarify the meaning of claim terms, court must take care not to import limitations into the claims from the specification." *Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009).

Although it is improper to read a limitation into the claims, "[c]laims must be read in view of the specification, of which they are a part." *Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004) (quoting *Markman*, 52 F.3d at 979). "Claims are not interpreted in a vacuum, but are part of and are read in light of the specification." *Slimfold Mfg. Co. v. Kinkead Indus. Inc.*, 810 F.2d 1113, 1116 (Fed. Cir. 1987). When the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life*, 242 F.3d at 1341.

However, the Federal Circuit has repeatedly cautioned courts against reading limitations into the claims based on a preferred embodiment: "although the specification often describes

4

very specific embodiments of the invention, we have repeatedly warned against confining the claims to these embodiments." *Phillips*, 415 F. 3d at 1323. Courts have also "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language, a court then may turn to extrinsic evidence, such as expert declarations and testimony from the inventors. *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in original). When considering extrinsic evidence, a court should take care not to use it to vary or contradict the claim terms. Rather, extrinsic evidence is relied upon more appropriately to assist in determining the meaning or scope of technical terms in the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).

Dictionaries also may play a role in the determination of the ordinary and customary meaning of a claim term. In *Phillips*, the Federal Circuit reiterated that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meanings of words . . . ." *Phillips*, 415 F.3d at 1322. The *Phillips* court, however, also admonished that district courts should be careful not to allow dictionary definitions to supplant the inventor's understanding of the claimed subject matter. "The main problem with elevating the dictionary to . . . prominence is that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim terms within in the context of the patent." *Id*. at 1321. Accordingly, dictionaries necessarily must play a role subordinate to the intrinsic evidence.

In addition, a court has the discretion to rely upon prior art, whether or not cited in the specification or the file history, but only when the meaning of the disputed terms cannot be ascertained from a careful reading of the public record. *Vitronics*, 90 F.3d at 1584. Referring to

prior art may make it unnecessary to rely upon expert testimony, because prior art may be indicative of what those skilled in the art generally understood certain terms to mean. *Id.*

**B.      Claim Construction.**

   **1.      "Website"**

The term "website" appears in Claims 20, 21, 23, 24, 25, 26, 28, and 29 of the '651 Patent.

KlausTech argues that the term "website" should be given its plain and ordinary meaning and must be construed to mean "a place on the World Wide Web that contains information through which a user can navigate." (KlausTech's Opening Brief at 7.) Defendant, on the other hand, argues that the term must be construed to mean "a client website (i.e. HTML document), from the client webserver, that is indexed by general search sites and contains code for the retrieval of a non-scrolling ad frame from the central controller." (*Id.*)

The key dispute between the parties is whether it is permissible for Defendant to import the specifications of the website being from a client server, that it can only be an indexed HTML document, and that the claimed website must contain code for retrieval of a non-scrolling ad frame.

During the claims construction hearing, KlausTech clarified that it did not intend to argue that "an ad is the claimed website." Still, Defendant contends that importing the limitation of the fact that "the non-scrolling ad frame never appears at the website" from the summary of invention section of the patent give purpose to the invention and distinguishes it over the prior art. *See Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340, 1346-51 (Fed. Cir. 2004). However, KlausTech resisted the importation of the limitations on the term in order to give meaning to the patent's alleged purpose. *See E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) (holding that the "court's task is not to limit claim language to exclude particular devices because they do no serve a perceived 'purpose' of the invention. Rather, the district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution. An invention may possess a number of

1  advantages or purposes, and there is no requirement that every claim directed to that invention
2  be limited to encompass all of them.")  Defendant argued that the suggested broad definition of
3  the term 'website' would result in the recapture of prior art when the purpose of the invention
4  itself was to improve upon the prior existing art.  KlausTech, however, resists Defendant's
5  attempt to import the limitations from the specifications and argues that importation of the
6  specific limitations would render the term meaningless.

7  The parties also argued over whether the definition of the term website requires the
8  explanation that websites are drafted in HTML.  Defendant argued that resolution of this hotly
9  contested issue would likely resolve the parties' conflict altogether.  The Court cannot resolve
10 as a matter of law whether all websites must be drafted in HTML; this is an area of proper
11 discovery, expert testimony, and further briefing at the summary judgment stage.

12 The generic term "website" has been construed to mean "a location on the World
13 Wide Web" or "one or more related web pages at a location on the World Wide Web."  *See*
14 *ACTV, Inc. v. Walt Disney Co.*, 204 F. Supp. 2d 650, 654 (S.D.N.Y. 2002); *VirnetX, Inc. v.*
15 *Microsoft Corp.*, 2009 WL 2370727, at \*9 (E.D. Tex. July 30, 2009).  In addition, although the
16 specifications mention all three of Defendant's suggested limitations, there is no support for
17 their importation into the construction of the term website.

18 Accordingly, the Court adopts the following construction:  "one or more related web
19 pages at a location on the World Wide Web."

20 **2.    "Non-Scrolling Ad Frame"**

21 The term "non-scrolling ad frame" appears in Claims 20, 21, 23, 24, 25, 26, 28, and 29
22 of the '651 Patent.

23 KlausTech argues that the term "non-scrolling ad frame" should be given its plain and
24 ordinary meaning and must be construed to mean "a frame which displays an ad and does not
25 scroll (when the user scrolls)."  (KlausTech's Opening Brief at 9; Reply at 5.)  Defendant, on
26 the other hand, argues that the term must be construed to mean "an HTML frame element that is
27 used to display ad content and is constantly located with regard to the viewed screen of the
28 browser."  (*Id.*)

7

The key dispute between the parties is the addition of two elements: (1) the non-scrolling ad frame is used to display ad content and constantly located with regard to the viewed screen of the browser, and (2) the non-scrolling ad frame is an HTML frame element.

Again, the Court finds that, on this current record, it cannot import the HTML limitation into the claim term without further discovery and briefing. KlausTech agreed that the non-scrolling could be defined to mean constantly located with regard to the viewed screen of the browser.

The Court adopts the following construction: "a frame element which displays an ad and is constantly located with regard to the viewed screen of the browser."

### 3. "Transmitting At Least One Page With a Non-Scrolling Ad Frame to a Browser"

The term "transmitting at least one page with a non-scrolling ad frame to a browser" appears in Claims 20, 21, 23, 24, 25, 26, 28, and 29 of the '651 Patent.

KlausTech argues that the term "transmitting at least one page with a non-scrolling ad frame to a browser" should be given its plain and ordinary meaning and must be construed to mean "transmitting at least one page with a non-scrolling ad frame to a browser." (KlausTech's Opening Brief at 10.) Defendant, on the other hand, argues that the term must be construed to mean "transmitting to a browser at least one page displayed outside the non-scrolling ad frame and that retrieves a non-scrolling ad frame from the central controller." (*Id.*)

The key dispute between the parties is the proposed addition by Defendant of the identity and function of the page being transmitted as "displayed outside the non-scrolling ad frame" (i.e., that it is not the ad frame content) and the page retrieves a non-scrolling ad frame from the central controller.

The Court adopts the following construction: "separately transmitting to a browser at least one page with an independent non-scrolling ad frame."

///

///

///

///

### 4. "Individual Timer"

The term "individual timer" appears in Claims 20, 21, 23, 24, 25, 26, 28, and 29 of the '651 Patent.

KlausTech argues that the term "individual timer" should be given its plain and ordinary meaning and must be construed to mean "the timer that corresponds to each ad." (KlausTech's Opening Brief at 12.) Defendant, on the other hand, argues that the term must be construed to mean "a timer specific to the ad content, set by the advertiser, and that sets a guaranteed minimum interval of display in the screen of the browser." (*Id.*)

The key dispute between the parties is the importation of the advertiser as the one setting the timer, and the idea that the timer sets a guaranteed minimum interval of display. The parties agreed that the timer must correspond to set the display time specifically to each ad.

The patent explicitly sets out that "it is *possible* to give the advertiser direct control of ad content and ad duration used with this system." ('651 Patent at 5:65-67 (emphasis added).) But an allusion to one possible implementation does not allow the Court to import the limitation as a required element into the definition of the term. In addition, the preamble of Claim 20 alludes to aim to achieve "ad display with guaranteed minimum timed intervals" but not clear that preamble can limit the definition of a term. *See Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997) ("[A] preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose of intended use for the invention.")). At the claims construction hearing, the parties agreed to the limitation "for a specific amount of time" which the Court adds to its construction.

The Court adopts the following construction: "an individual timer specific to set the ad display for a specific amount of time."

///
///
///
///

9

### 5. "Central Controller"

The term "central controller" appears in Claims 20, 21, 23, 24, 25, 26, 28, and 29 of the '651 Patent.

KlausTech argues that the term "central controller" should be given its plain and ordinary meaning and must be construed to mean "typically a computer or collection of computers." (KlausTech's Opening Brief at 14.) Defendant, on the other hand, argues that the term must be construed as a means plus function term governed by 35 U.S.C. section 112 paragraph 6, indicating that the function should be found to be: "interrogating for browser identity and maintaining records associated with the browser identity indicating ad identity displayed, and timer timeout." And the corresponding structure Defendant advances is: "system controller S as described by the '651 Patent Fig. 1, 4:23-5:6." (*Id.*)

In the alternative, Defendant proffers an alternate construction of the term "central controller" to mean "a device or collection of devices having a database to provide site accounting used to compensate advertisers for the total time of ad display to a particular browser and that directs non-scrolling ad frame set up in the browser; generates, dispenses and interrogates for unique browser identifiers; maintains records associated with the unique browser identifiers indicating ads displayed and ads available for display; and dispatches to inquiring browsers ad content." (*Id.*)

The first key dispute between the parties is whether Section 112, paragraph 6 governs where the term "fails to (1) recite sufficiently definite structure *or else* (2) recites function without reciting sufficient structure for performing that function." *Williamson v. Citrix Online*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (citation omitted). KlausTech's contention that the "central controller" is *typically* a computer or collection of computers may indicate that the term does not connote any specific structure. Defendant also proffers an alternative construction, but Defendant's proposal selects statements from the specification and reads them into the claims.

In addition to advocating that the generic meaning of this term is sufficient, KlausTech contends that the term "central controller" should not be considered a means-plus-function term lacking the word "means." However, merely because a terms does not include the word

10

"means" does not automatically prevent the term from being construed as means-plus-function element. *See, e.g., Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 431 (Fed. Cir. 1996). "In making the assessment of whether the limitation in question is means-plus-function term subject to the strictures of § 112, para. 6, our cases have emphasized that the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348. If a term lacks the word "means," the presumption can be overcome and section 112, paragraph 6 will apply if the challenger demonstrates that the claim term fails "to recite [] sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function." *Id.* (citing *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). Here, the construction proffered by KlausTech does not advance the jury's understanding of this very vague term. Without indicating the function of the structure, the Court finds the generic term is essentially without meaning.

Construction of a means-plus-function claim involves a two-step process. *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). In the first step, the Court must identify the particular claimed function. *Id*. In the second step, the Court looks to the specification and identifies the structure that corresponds to that function. *Id*. A structure is a "corresponding structure" only if that element is necessary to perform the function recited in the claim and is clearly linked to that function by the disclosure in the specification. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001). The patentee's "duty to clearly link or associate structure to the claimed function" represents the fair exchange for the convenience of employing means-plus-function claim limitations. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1377 (Fed. Cir. 2001).

The Court adopts the following construction: "A computer or collection of computers for interrogating for browser identity and maintaining records associated with the browser identity indicating ad identity displayed, and timer timeout."

///

### 6. "Interrogating"

The term "interrogating" appears in Claims 20, 21, 23, 24, 25, 26, 28, and 29 of the '651 Patent.

KlausTech argues that the term "interrogating" should be given its plain and ordinary meaning and must be construed to mean "simply checking for a condition/status or for the existence of specific information." (KlausTech's Opening Brief at 17.) Defendant, on the other hand, argues that the term must be construed to mean "requesting information to obtain an answer." (*Id.*)

The parties agree that the term means "requesting," but had disputed whether the construction should include the provision that the component is requesting information "to obtain an answer." At the claims construction hearing, they agreed to omit that portion of the proposed construction.

The Court adopts the following construction: "requesting information."

### 7. "Timer Timeout Report"

The term "timer timeout report" appears in Claims 20, 21, 23, 24, 25, 26, 28, and 29 of the '651 Patent.

KlausTech argues that the term "timer timeout report" should be given its plain and ordinary meaning to be "the report containing timer timeout information" or alternatively, to mean "reporting from the browser to the central controller of the timer timeout of the ad content." (KlausTech's Opening Brief at 19.) Defendant, on the other hand, argues that the term must be construed to mean "a report or record of time of display that is recorded at the central controller and records the timeout of the ad content that was displayed in the screen of the browser for a guaranteed minimum time interval." (*Id.*)

The key disputes between the parties are (1) whether the term is properly construed to indicate it is "recorded at the central controller" and (2) whether the term includes the time of display. Defendant also seeks to add the limitation that the "ad content that was displayed in the screen of the browser for a guaranteed minimum interval."

The Court adopts the following construction: "a report or record of the guaranteed minimum time interval an ad was displayed that is recorded at the central controller."

### 8. Browser Identity.

Although KlausTech did not raise any arguments in their opening claim construction brief on the meaning of this term, KlausTech preserved their dispute by briefing contesting the construction in the parties' joint claim construction and prehearing statement. (*See* Statement at 6-7.)

The term "browser identity" appears in Claims 20, 21, 23, 24, 25, 26, 28, and 29 of the '651 Patent.

KlausTech argues that the term "browser identity" should be given its plain and ordinary meaning. (*Id.*) Defendant, on the other hand, argues that the term must be construed to mean "a unique identifier for the browser." (*Id.* at 6.)

The key dispute between the parties is whether the browser identity must be unique. The Court finds without this specification, the term is rendered without significant meaning. The identifier is described in the patent as following a unique browser. (*See* '651 Patent at 3:3-6, 3:12-15.) "Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper." *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (citations omitted).

The Court adopts the following construction: "a unique identifier for the browser."

### 9. Non-Scrolling Ad Display.

Again, although KlausTech did not raise any arguments in their opening claim construction brief on the meaning of this term, KlausTech preserved their dispute by briefing contesting the construction in the parties' joint claim construction and prehearing statement. (*See* Statement at 7-8.)

The term "non-scrolling ad display" appears in Claims 20, 21, 23, 24, 25, 26, 28, and 29 of the '651 Patent.

13

KlausTech argues that the term "non-scrolling ad display" should be given its plain and ordinary meaning. (*Id*. at 8) Defendant, on the other hand, argues that the term must be construed to mean "a graphical display in the screen of the browser of ad content within a non-scrolling ad frame." (*Id.*)

In its reply, KlausTech states that it does not dispute Defendant's proffered construction.

Accordingly, the Court adopts the following construction: "a graphical display in the screen of the browser of ad content within a non-scrolling ad frame."

## CONCLUSION

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed terms. The parties are ORDERED to submit a further joint case management report pursuant to Patent Standing Order ¶ 13 by no later than June 24, 2016.

**IT IS SO ORDERED.**

Dated: May 23, 2016

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE